Good morning, Chief Judge Elrod, and may it please the Court. Matthew Owen, on behalf of AbbVie and its affiliated entities, who are the plaintiffs and the appellants here, AbbVie manufactures life-saving medicine, and it sells it in interstate commerce, including in Mississippi and throughout the country. It is also a participant in the federal Medicare and Medicaid programs, which Congress has incentivized manufacturers to join or not join on a nationwide level, there's no state-by-state opt-out, in exchange for certain mutually beneficial conditions. Congress wants to attract drug manufacturers to that program because it wants the federal government's insurance, Medicare and Medicaid patients, to have access to AbbVie's drugs, and AbbVie, of course, wants to have access to those patient populations. But in order to get access to Medicare and Medicaid, Congress has decreed that manufacturers must also agree to participate in the federal 340B drug program, which is outlined in federal law. This case is not about what the federal 340B program requires of manufacturers exactly, but that federal set of requirements is the backdrop against which the Mississippi state law operates, and I think it's pretty clear from the briefs and the various opinions from courts around the country on this subject that it's kind of complicated. So if it's all right, I'd like to take just a second and try to describe how that system works. Federal law says that if you want to sign up for Medicare and Medicaid, you have to also enter into PPA, a pharmaceutical pricing agreement, with the secretary of HHS. Federal law says that in that agreement, the agreement has to require that the manufacturer offer each covered entity certain outpatient drugs at or below the ceiling price, if you sell it at any other price. Importantly, the statute doesn't actually require any manufacturer to sell those drugs at all costs or on any terms, but it does require that you make an offer, and the offer has to include the price term that Congress has specified, and as Judge Katz's opinion for the D.C. Circuit in Novartis has recently explained, the non-price terms Congress reserved to the manufacturers to set within the bounds of reasonableness, which the agency, HRSA, will enforce as part of an integrated and comprehensive federal enforcement scheme. Against that backdrop, there's one other federal rule that I want to make sure we get on the table, and that is the rule against diversion. This is a statutory prohibition. It gets, it's much simpler in its text than it is in its explanation sometimes. The text says that a covered outpatient drug, that's a 340B drug, can't be resold. It says a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of a covered entity, and importantly, of course, a contract pharmacy of the kind issued, at issue in these cases, is not a patient of a covered entity. That is the federal law baseline at which the Mississippi law has entered, and here is what the Mississippi law says. It says that a manufacturer or distributor shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, the acquisition of a 340B drug, and I'll come back to what that means in a second, or delivery of a 340B drug to a pharmacy that's under contract with a 340B entity. What that is, is a prohibition on AbbVie refusing to allow someone else to acquire its own property at confiscatory prices under circumstances where it does not want to sell at that price, and Congress has not required it to sell at that price. And what that, and if I could add, the use of the disjunctive acquisition or delivery of a 340B drug means that the statute on its face is extremely clear about this. The statute is a required, kind of a negatively phrased, you can't deny the acquisition of your drug by the pharmacy. That's the same thing as saying you must allow them to acquire it at that price. The further definition where it says delivery of a 340B drug, the statute defines a 340B drug to mean a drug that has been subject to an offer for reduced prices and then purchased by the covered entity. And understand that can mean we offer it on certain terms, including we won't cooperate with this unlimited contract pharmacy distribution model, but if you agree to our more reasonable restrictions that federal courts have largely upheld, then we'll sell it to you at the 340B price. If you don't want to agree to those restrictions, we'll sell it to you at the commercial price. That is how it works. But the statute, the Mississippi law, says you can't interfere with the delivery of a 340B drug, meaning delivery at a particular price. That is a circumlocutory way of saying you have to provide the 340B ceiling price to contract pharmacies when Congress said you don't. And you know that Congress said you don't, because Congress enumerated in the 340B statute 15 carefully delineated, very specific, non-profit covered entities to which this 340B special pricing can apply. Can I ask you a question, sir? Sure. We appreciate you explaining how this all works. Several other cases challenging HB728 are making their way through the courts. Yours is the only one that I've seen that has included takings claim. Is that unique to this case, or are you aware of any of the others with the takings claim? It is not unique to this case. I wouldn't be able to catalog the particular cases where AstraZeneca, which is not before the court on a preliminary injunction posture, has also raised takings claims in various of its litigation against similar state laws. AstraZeneca tends not to seek preliminary injunctions. Does your client have a compensable property interest in the drugs, or is this a regulatory taking? I think it is clearly a physical taking, and the reason is because a physical taking occurs when you lose title to the thing. And the statute here says acquire. That means I own it, and then the pharmacy acquires it from me, and now they own it. And in the Horn case about raisins, and in Loretto and Lucas, the Supreme Court has made very clear repeatedly that it's a big deal difference, but it's a categorical difference. Regulatory taking is when the government restricts the way you can use your property, and then we have a question about how much of the economic value has been diminished and whether it serves a public purpose and the usual Penn Central factors. But if you lose title to the thing, if you own it and then the government says your raisins now belong to someone else, or your drugs, you must sell them to a contract pharmacy who wants to buy them, or a covered entity that wants you to deliver them to a contract pharmacy at a 340B price when you don't have to do that, then you lose title to the thing. And that makes it a physical taking and a compensable property interest for that reason. So when does your property interest, when does your client's property interest end? When it gets to the pharmacy? I think when it gets to the pharmacy, our client's property interest ends because either one of two people who isn't us now has title, right? Either it's the covered entity, because maybe, as they're supposed to do, they have some arrangement with the pharmacy whereby the covered entity, the clinic, the non-profit, is somehow maintaining title to these drugs. Or as the record shows, it's really just that the pharmacy takes title. But either way, it's not us. And whether it's one private party A, the entity, the clinic, or private party B, the pharmacy, so long as the state of Mississippi is saying you have to let them acquire your drugs, or you have to deliver them to them at this price that you don't want to charge, then we lose title at that moment. I would mention, Judge Clement, that there is some confusion about this in the briefs, I think, but the record is pretty clear. And I would point you to a couple of places. Probably the most kind of neutral place to look is the declaration of Rear Admiral Pedley, who is the administrator of HRSA. This is found at page 112 of the record. And on page 115, she explains very clearly how this works, which is that when manufacturers get 340B orders, what happens is that the drugs get shipped to a pharmacy, and they get placed on the, in the, quote, general inventory of the pharmacy. And what that means is, as Mr. Shidler's declarations, he has two of them in the record. One is at page 69, the other is at page 711, and the following pages. Describes how this works. If AbbVie gets a 340B order, what that, all that means is that you take a bunch of drugs, some of them at commercial prices, some of them at 340B prices, and you put them on a pallet, and you ship them to the pharmacy. They are indistinguishable to us or anyone at the moment of delivery. So this regulation has nothing to do with delivery. When they get to the pharmacy, it gets placed on the general inventory shelf, and anyone who walks in the door can be sold that drug at commercial prices, at whatever the pharmacy is charging. And at the time of the sale, no one knows whether that person is or is not a 340B patient. Because that determination is made after the fact, as an accounting measure, and when the pharmacy thinks that they've sold enough drugs out of their own inventory that they, that could have been eligible for 340B dispensing, they seek a replenishment order, which is basically a, think of it as an in-kind post-sale rebate. Like, we sold a bunch of stuff to 340B patients, therefore give us more drugs at 340B prices that we're going to stick on the shelf and we'll sell to anyone. And here I would remind you that the federal statute says that a covered entity may not transfer the drug, the chattel, to anyone who isn't its own patient. And yet the whole scheme here is that you sell, you get a drug at 340B prices, and the pharmacy is going to first basically take title to itself, they're not the patient, and then they're going to distribute it to anyone who comes in the door, who doesn't also have to be the patient. That is the abuse of the 340B system that has arisen after basically 2010, until recent federal court litigation in the Third Circuit and D.C. Circuit ran into that. What is the label? I'm sorry, go ahead. A particular amount of these drugs, are they identified that have to be sold or provided to Medicare and Medicaid or low-income people? How do you keep track of that? So I want to make sure I understand your question, Judge Clement, but I don't think that there's any rule about Medicare and Medicaid patients. The only connection between Medicare and Medicaid, but it's an important one, between Medicare and Medicaid and 340B is that Medicare and Medicaid are their own program. And in fact, in some ways Congress has invited states to kind of participate in Medicare and Medicaid in some ways. But if you want to participate in that at all, you separately have to do this purely federal 340B thing. And in the Supreme Court's decision in Astra, the court said all these programs are integrated. Justice Ginsburg's opinion from the court said, yeah, this is all an integrated whole, these three things, and they have to be calibrated together. So from our perspective, the chief relevance of Medicare and Medicaid is that's the carrot that Congress used to incentivize us to participate in the 340B program. But let's just say for takings purposes, Mississippi has provided no such benefit. There is no Mississippi program like Medicare and Medicaid that they are allowing us to participate in in exchange for agreeing to HB 728, like Congress did. Congress paid for our willingness to give up our property by giving us access to Medicare and Medicaid. Mississippi did not. And in their brief in this case, I want to make sure I say this very quickly. Below, the state tried to defend against our takings claim on the ground that we voluntarily participated in the federal program. Judge Ozer didn't really buy that. The government's repeated it here. But I think it's plainly not right. We voluntarily participate in the federal program, not in the state program. And therefore, Mississippi's law has to stand or fall on its own two legs. We're going to give you two more minutes and also give your friend on the other side two more minutes, because this is complicated. Can you answer a couple of questions that I have? One relates to whether or not there could be . . . where the district court erred? Where do you think the district court erred in determining that there was a gap in 340B that would allow this to occur? And it was not just a gap for the manufacturers, but it could be for state health and safety. And then the second question is, what is the lay of the land in all the other circuits on this problem right now? Because all these other states are doing this, too. Sure. Not all the other states, but a number of them. I'll do my best. First, I think on this issue, and I take Your Honor's question now to be basically about the preemption question. I think the error on the takings part is, in addition, expanding Kelo to something other than an integrated economic plan of the kind Kelo described. Of the gap question that you just mentioned, Judge Elrod, what I would say is that it's a category error. The district court thought the presumption against preemption applied because this was a regulation of health and safety in a gap for delivery regulations. But the Mississippi law, forget what the 340B law may or may not say, this law is not a regulation of delivery because, again, A, on its face it says acquisition or delivery. And as for delivery, it says delivery of a 340B drug, which is defined to mean a drug offered at the reduced ceiling price. So there is, and three, the record evidence shows, as the judge in the Southern District of West Virginia explained in his very careful opinion, that there is no effect on delivery. The only thing that this is doing is changing the price. And, in fact, I would point, Your Honor, in the record, not only to the declarations I just mentioned, but to pages 376 and 77, which are arguments of counsel for 340B entities in a Louisiana case where he says, yeah, this is just an accounting mechanism. Just after the fact, he changed the price. That's all it is. So, in other words, I think the district judge was just, I think, mistaken that this is a delivery regulation that could fit into such a gap. Because it isn't such a regulation, that gap doesn't apply. And the last thing I would say is because the only thing that this law does is touch and regulate a federal program, everything about it is 340B. The 340B program went away, so would the Mississippi law. Then this is much more like McCulloch v. Maryland or maybe Buckman, right, where the only thing that this law is aimed at is a federal instrumentality or program that the state wishes to directly attach itself to and alter its basic functions. What prohibits every single state and every single pharmacy from attaching itself to this if this is allowed to be, and then that just becomes the market price for the drug? Nothing, Your Honor, except the really big deal problem is that about 12 states, I can't remember which of them have been signed into law or not, have started to do this in the wake of this decision. And after that, they are all different. I mean, they all have different requirements. And because this is a federal spending legislation that you can only opt in or out of at the national level, allowing states to change the conditions of Medicare participation will eventually, what they're doing is raising the cost of admission to a federal program above the level at which Congress has set it and therefore added to the deterrence value of adding the program. In 10 seconds, Your Honor, the only court of appeals to have addressed the question is the Arkansas court in Pharma v. McLean. I know we've tried to address that in our briefs. And in 9 seconds, the 80. Go ahead. Let me answer the question. Sure. There are a number of appeals impending in the Fourth Circuit. There's two. The District Judge in West Virginia agreed with us and granted us a preliminary injunction on the preemption grounds that we've just described. The District Court in Maryland disagreed and held for the state. And both of those cases are pending on appeal, but they have not yet been set for argument. What do you want us to hold specifically? This is not foreshadowing. Sure. Either one of two things or both. First, HB 728 is unconstitutional because it is preempted. It conflicts with the federal 340B statute, both because it alters the terms of Medicare and Medicaid access and because it is not a delivery regulation but a regulation of price. And finally, because it divests the agency and its administrative dispute resolution panels of the exclusive authority to adjudicate exactly these kinds of federal questions that the Supreme Court explained in ASTRA would be their responsibility, rather than allowing state courts to have parallel proceedings. That would be number one. And then on the takings question, because Mississippi is requiring us to sell our property at a confiscatory prices when we don't want to do that, the method by which they've chosen to regulate is a forced sale. We would ask you to hold that. That claim is not barred by the voluntary participation doctrine because Mississippi hasn't offered us a benefit or program to participate in. And this is not a public use within the meaning of KELO because it is not part of an integrated economic plan. Here, the record shows that the money just gets kept by a for-profit contract pharmacy or kicked back to a hospital or clinic that does not have to reinvest the money in public uses, uncompensated care, or share it with patients. So on the record and on the face of the statute, there's no control or tailoring that would cause this to be a public use. So we think it's unconstitutional for both reasons. Thank you. May it please the court. Scott Stewart on behalf of the Mississippi Attorney General. As the court may be aware, this is the third time, certainly Judge Ramirez is aware, the third time I've stood before this court to defend this particular law. I've come to appreciate something that my friend Mr. Owen recognized that this is a complicated area. I think there could be some benefit to me doing something similar to what Mr. Owen did and trying to just kind of lay out the framework, especially because I've come to appreciate that the challengers in these cases and certainly AbbVie, their pitch rests on a kind of factual narrative about what's going on under the 340B program under Mississippi's law, about who benefits from the program, about contract pharmacies, and about what Mississippi's law does. You've seen words in the brief like arbitrage, kickback was a word I heard today, no benefits to patients, and this idea that this program is just being exploited to line the pockets of contract pharmacies. The district court did not accept that factual narrative, and the record does not support that narrative. And I think I'll do my best, and I recognize I may not be able to get all of it out, but I'd like to just walk through a few things that I think could be useful that I wasn't able to perhaps hit the nail on the head on in the first two arguments I did in this case, because I think it anticipates a lot of kind of the legal issues and some of the key issues before the court that hopefully will be responsive to some of the court's questions. As the court is aware, under the 40B program, covered entities, these non-profit safety net hospitals, for example, buy these drugs from drug makers at discounted prices. Those drugs go to covered entities' patients. Covered entities can do basically one of two things with those drugs going to those patients. One is they can pass along discounts. We see in the record that some hospitals do that, for example, to uninsured folks, perhaps with discount cards. But the second thing, and this is what I'd say it's fair to say is the more dominant practice, is that somebody buys those drugs, they may pay their copay, and then there's a full reimbursement by insurance, and the bulk of that money ends up going to these safety net hospitals. So that's, and the idea of that, and this is sort of the engine of 340B, the logic of it, what it's trying to do is it's bringing revenue to non-profit safety net hospitals so that they can offset the costs of uncompensated care, for example. Even if it's a completely lovely thing that helps poor people get care when they otherwise wouldn't, why does Mississippi have the right to demand that they get the product at a reduced rate? Sure. So I'm going to explain exactly why that is, Your Honor, because what I was about to say is the critical thing to make that program work, and I realize that... Regardless of whether it's important, and it has to happen for it to work, and it wouldn't work, not every good idea can be demanded of private participants. We don't confiscate people's products and property in order to help even the most beneficent and wonderful of causes. We don't do that. Understood, and I appreciate the point, Your Honor. I would disagree. Can you help us while you're allowed to do that? Because there's not confiscation here. The covered entities are paying for these drugs at the prices that AbbVie and other drug makers agreed to sell them at. Agreed to sell them in the program that they signed up through Congress with. That's right, Your Honor. That's not the market rate. This is the whole problem with the drug industry, that we don't have market pricing, but that's a whole other topic. It's a highly regulated market. Definitely, Your Honor. But why... They didn't ever agree with Mississippi to sell them the product at this rate. And that's what I disagree with, Your Honor. Where did they do that? Tell me. Help me. Where did they do that? So, Your Honor, the position is in short this, or the reason is in short this. This 340B law does not address the issue of how are drugs going to get into the hands of patients. It's always been understood that that has to happen. If these drugs do not get to patients, the program is pointless. It doesn't work. And pharmacies are the one that enable that to be done. I mean, they have the facilities to house these drugs, dispense them, give appropriate instructions, those kinds of things. So pharmacies are needed in some way. They're critical. They make the program work. Again, they get the drugs in the hands of patients. They make the 340 program work. That's right, Your Honor. That's right, Your Honor. I mean, they make the work... In short, I mean, they make the program work better because they ensure that drugs that a covered entity buys can actually get in the hands of patients, in part because of convenience. And that's terrific. Where did Mississippi get them to join some program under 728 that says that they can get the drugs at that price? Sure, Chief Judge. You're all right. So when somebody buys into a participation in a broadly regulated federal program, they also buy into reasonable and expected state law regulations that come with it. I'll give you an example, Your Honor, because I recognize that this is a different area. Suppose that instead of a contract pharmacy, a one pharmacy policy, suppose that instead AbbVie had an anti-pharmacy policy. And their policy was, we will not ship drugs to pharmacies, period. We instead want to ship drugs to fly-by-night, unlicensed people who then, you know, they'll distribute them if they want. And if Mississippi were to say, well, no, our state law requires that people dispensing drugs be licensed, that they not be these sort of quasi-criminal operations, I don't think AbbVie could seriously come here and say, we don't want to do that. That's a taking. We did not sign up for Mississippi's law. I think the answer... Well, that's a different thing altogether. It's, they get a, how does Mississippi get for all of the pharmacy clients the price that was negotiated by Congress for a particular group of people, and that they get that as the, that becomes the de facto market price in Mississippi. That seems rather than, you know, that they have to sell in their market. I mean, I'm talking about in the wholesale market, not in the retail market. But because, but why would that be appropriate? For all, how did they ever agree that they would sell much more of the drug at a discounted price? When did they ever agree to do that? So, two responses to that, Your Honor. One is, I simply disagree with the factual proposition. The district court did not accept the factual proposition that it's just contract pharmacies buying these drugs as sort of a new covered entity. It is the covered entities buying that drug. That, that's shown by the peddly dec... The covered entity buying the drug. The covered entity is, is these safety net hospitals. The University of Mississippi Medical Center is the Memorial Gulfport Jackson kind of examples. So there, so there is not an additional quantity at the lower price. It's the same quantity that would be delivered at the lower price. They're not having to deliver additional quantities at the lower price than they ordinarily would have to in the absence of this statute. That's right, Your Honor. I mean, I'd say two responses to that. One is, Abdi agrees that if a covered entity asked for, you know, unlimited quantities, Abdi, and they said send it to our, to our central hospital, Abdi would have to send those drugs. It's only when Abdi says, hey, could you also send it to these far flung pharmacies, which are closer to our patients, that Abdi says, no, no, no, no, no, we don't want to send those drugs. The number of patients isn't changing. The question is whether the covered entity's drugs can actually get to its patients. So there's no taking? There's no taking. Because you're saying factually they're not delivering drugs at a cheaper price to more people than they already agreed to deliver. Is that your position? I mean, in essence, yes, Your Honor. I would say that, again, it is the factual situation that the district court understood and accepted, and it's also just on the face of this law. It is the covered entity buying these drugs, and no one disagrees that the covered entity is entitled to buy however many of these drugs it wants. Well, wait a minute. Can the covered entity buy the drugs and then sell them out of, you know, out of their garage at an inflated price to other people and kind of circumvent the whole process? I, uh, so two responses to that, Your Honor. One is, um, there is not a requirement that the covered entity offer these drugs at a lower price. They don't have to, they don't have to offer them or pass on the discounts. So they could buy more than they actually need for the people that are in the programs and then, and then, and then buy, buy extra so that they can then sell those at the market price. And so that's not for the 340 project at all. It's just so that the pharmacy can make more money. Help me. I see what you're saying. So the answer is no, they cannot do that, Your Honor. They can't go to sort of outside patients. I mean, I guess I have a question. What is a patient of a 340 B entity? Is it a person who is a covered by one of these Medicare and Medicaid programs that judge Clement was asking about? Or is it anybody who walks in off the street? So we don't know if the person's in one of the needy people that the 340 is supposed to be helping. I'm not sure I'm going to be, I will, I will say this, Your Honor, there has been litigation over what qualifies someone to be a patient. We have not kind of, I think, crossed swords over that precise issue there. So I don't want to sort of seem like I'm not answering the question, but I think for, for the purposes today, I mean, it's somebody who has some kind of patient doctor, patient type relationship with one of these safety net hospitals that are in a very significant way, maybe not exclusively serving low income individuals, but to be a covered entity, that's the kind of stuff they have to do is, you know, these, these are the kinds of hospitals that provide a lot of uncompensated care. I mean, care that people just can't pay for. And again, I think, so I guess to answer your question earlier, Judge Elrod, these are not going, these drugs cannot go to non-patients to just sort of align the pockets of, of pharmacies. They're going to patients. Reimbursements come back from insurance that help basically these covered entities stay afloat. I mean, a good example is page 279 of the record. This is a Memorial Hospital Gulfport that says, Hey, look, we need these, this money to function, to continue operating without this, this subsidization through this program. We have a $30 million deficit. We could have to cut services. And you know, the record therefore very much shows similar for University of Mississippi Medical Center at 275 to 276 of the record, the lot declaration 284 to 286. Again, this is how the program is supposed to work. I don't know if this is how the 340 is supposed to work or not. I guess I'm not yet convinced that it's supposed to help subsidize all these other good causes that Mississippi wants it to subsidize. I'm not clear on that. So maybe you could help. Sure. So, so let me, let me make two observations, Your Honor. So that's a fair point. Um, one is nothing in the 340B statute requires that discounts on drugs be passed on to patients. So that, that is, that is signal number one, single number two is the only hospitals covered entities that can qualify for this are again, safety net hospitals that, that address kind of low income, other vulnerable populations. So the thinking behind this, and there's also legislative history. There's an often cited, um, I believe house of representatives report that say, Hey, look, the idea of this program is to let these, um, strained entities, stretch scarce resources as, as far as possible. The idea of the 340 program in general, right? Your Honor. That's not the, this piggybacking program. What's to keep every state from piggybacking and then it depresses the price across the board for the, for the, for, for that, that the pharmacist pharmacies will all over the country, get the drug at that price now, because they also happen to distribute through the 340 to the special hospitals, et cetera. Right. So, so two observations or responses to that, because I do appreciate the concern. Your Honor. One is it's not piggybacking. I mean, again, this was, everything was going as it was until we started seeing these contract pharmacy policies that created this delivery problem where drug makers like AbbVie refused to deliver these drugs. It's not just a delivery problem. It's a pricing problem. It's not I will deliver as many of these drugs as possible to a covered entity central location. It's only when we say, Hey, look, when a covered entity says, Hey, please send these to other pharmacies that I work with to get them to my patients that AbbVie says, no, it isn't. And again, this brings me back to the key point of the 340 B program is that it's the covered entity that has to get its drugs to this patient for it to get the benefit of this revenue. If you can't get these things, these two patients, and you know, that's true under the replenishment model or otherwise, because it needs to send drugs to replenish. Even though you didn't like my word, piggybacking, because you think it's maybe integrated into the program, but, but right now not every state does this. So it's not fully integrated. My question was, assuming it is fully integrated or fully piggybacked, depending upon your perspective, why doesn't that depress the price through in so that the drug is no longer can be sold to pharmacies at the price that used to could be sold, um, in, in anticipation of market full, full retail sales? Sure. So two responses on that one, Chief Judge Elrod. The first is, as Mr. Owen says, I mean, AbbVie sells these drugs, sends these drugs to your CVSs, your Walgreens, your other, other drug stores at commercial prices all the time. It can keep doing that. It's only for the patients of these safety net hospitals that are going to be able to, again, get the benefit of, of these drugs. Are you saying every state can do this and it's not a big deal and it doesn't actually depress the price? Is that the answer to my question? I'm asking, why doesn't every state do this and get this tremendous benefit if, if it's really part of the whole intention of the 340? So, yeah, so two responses to that, Your Honor. I mean, one is, um, states could not have the same kind of far-flung population problem where people are far away from hospitals. They may not face the same issue, but I, I, I'd offer this example, Your Honor. I mean, at page 133 of the record, Mr. Owen conceded in the district court that say, hey, look, you know, it's not the, you know, if you have a true delivery regulation, um, say if, if a state required, um, that, uh, drugs be transported in temperature controlled truck, trucks inspected by the state DMV, um, you know, that would not be preempted, for example. That's just to say that states could do, you know, a bunch of states could do one thing on that. A bunch of states could do something on the other. So again, if it's something, it's an area where the states can regulate, it's fine for there to be different approaches across states. And I mean, that's just true of health and safety regulation generally. And it's true here. We're not, that's great that you can have certain health and safety regulations, but this is, do you, are you saying that this will not affect the price? I mean, we have not affected the price and we have not dictated a different price. And again, it's not a regulation of price. I mean, it's, you have to sell to us this quantity at this price, which is a lower than market, lower than wholesale price, you know, it's, um, because it's going to be reimbursed at a lower than market price. And so it's, but that's been it for a certain amount of people. It's been paid for, but not over that amount. So that's not true, Your Honor. So help with that. Yeah. So that's what they said. Right. So, so in short, I'll put it this way under the program, you know, you have some number of patients of covered entities. Let's just keep it simple and say it's a thousand people in Mississippi. Um, a drug, a covered entity is entitled to purchase. If they, if they have those thousand patients, they're entitled to purchase however many drugs that they need for those people. Let's say, let's say a thousand units, a thousand units. So they're entitled to an app. He agrees that if we said, if the covered entity said, send them to our main hospital, say UMMC, um, you would have to do that. The problem is that a lot of patients of University of Mississippi Medical Center live hours away. I assume that they're going to send 950 units to the hospital and then 50 units to rural pharmacies or other places. Okay. Right. And that's what you're saying is what's happening, right? If our law can prevail, then that is what's happening because we're saying you cannot obstruct that delivery. So what you're posing your friend saying is that you're instead asking for 1400 units, some of which will be sold in the pharmacies, like 200 of those, uh, or if in the pharmacies right there with the same pharmacies where they're being delivered, not for these thousand patients, cause we got 1400 units, you know, we could some, or that actually we just make all 400 go to the non, the non needy patients for lack of a better term. Right. And that means that there's still, even with that other 950 going one and 50 going or whatever it was, that's okay. The 950 and the 50 part, that's, that may be what the statute said, but it does not say anything about this other 400 units. So if I'm understanding the, the, the hypothetical correctly, chief for general, the statute bars that other 400 units if they are going to non patients, like the federal law bars that what's a patient, how do they, it's not, they're going to see a patient pharmacy. They're just going to sell it at their pharmacy on the shelf for the retail price. Your honor. I'm so two responses that one that's not invariably true for people with discounts. The other, the other part is there's an obligation to make sure if one of those general inventory items is sold to a covered entities patient, that the covered entity replenishes that exact item. To the extent that's not happening, that may be a violation of federal law. It may be diversion. It may be another issue under federal law. It's, but that is a, that is again, a problem under federal law. I'm not saying that that's what's required by Mississippi law, that you send the 1400 units even when there's only a thousand patients that otherwise would be there. Absolutely. That's what I'm saying. Your honor is that the Mississippi law is not requiring the extra 400. It's just saying you can't obstruct that 1000 it's including and especially that 50 all what I understand the product and the district. So that's why I led with the observation, your honor, that my friend's case rests on a factual narrative that the district court did not embrace. Um, I would point the court to, for example, 7 81 to 7 82, 7 88 to 7 90, 7 86 to 87 where it says, um, and if I read those two quickly, I essentially 7 81 to 7, uh, 90 is going to have a lot of the key points here, but it's, it's the point that this is not expanding the pool of patients. This is, um, going to patients of the covered entity. If it's not going to patients, that's a problem under federal law. It's not something that Mississippi compels. I mean, at each turn, Mississippi law respects the federal regime. Um, in my, in my waning time, if I can maybe just give the elevator version pitch of why there's no preemption, why there's no, no taking, um, on, on preemption, which I think was the lead claim, at least in the district court. I think Mr. Owen in his kind of request for relief in your, in response to your question, chief judge led with preemption. Our simple position is that silence doesn't speak. Judge Beavis recognized that in his Sanofi third circuit decision and the idea that this very comprehensive statute on price that does not mandate any certain form of delivery somehow commands a conclusion. Basically silence does not pick a winner or loser on delivery. It leaves it to state and private actors. The state is allowed to regulate in the public interest to make sure that these drugs are delivered to places in need. Um, on the takings claim, I would just, uh, emphasize the following. Um, you know, obviously my, my friend is very much leaning on the physical taking idea. I'm aware of no case in the history of American law that finds a taking in the circumstance in circumstances like this one. I mean, under three 40 B and under state law, um, what happens is drug makers agree to sell their drugs at a set price to certain hospitals under state law or in those hospitals agree here to buy those drugs at that price from drug makers. All, all Mississippi law does is say, Hey, you cannot obstruct the delivery of those drugs to the pharmacies that are dispensing them on a covered entity's that is certainly not a physical taking. Um, and again, this is an area where Abby voluntarily agreed to some measure of regulation. I see my time is if it did allow Mississippi to demand the 400 extra units to go to the pharmacy, would that be a taking under this statute for 400, meaning for non those who are not patient in the hypo. There are 1000 units needed for 1000 people, and then they were demanding 1400 units to be delivered. And so the 400 extra units that are not for the 1000 patients that need the one unit each, you know, is that mean that if it did do that and said no, under our statute in Mississippi, you must deliver us 1400 instead of 1000. Would that be a taking? It may be your honor. But what I think it need more direct answer was it sounds like that is a violation of the 43 40 B statute itself. It's a violation of the federal statute. I'm asking if it's a constitutional violation under the Mississippi law, which is one of the things they've pled. And so then we have to sort out the facts right on that. I would emphasize the district court did not adopt their answer the question legally. Sure, your honor. So I mean, it sounds like that's completely out outside the confines of the program, and it is a direct, you know, you will give this property to some other private party. So as I stand here, I mean, that sounds like a potential taking. Um, I would just say it's not factually what is happening here at all, and it's just it's not what the district court found on the record before it, particularly in light of the declarations. I know it. I'm hitting over time. May I ask a question? Mr Stewart, who decides how much to order the covered entities with the patients or the state of Mississippi? Who decides how much the drug manufacturer has to provide? It's the covered entities placing whatever the order of whatever it needs with the drug maker. Your honor is the covered entity placing the order, or is the pharmacy placing the order? It's um, according to the balance of the evidence, it's the cover. It's the covered entity. Your honor. I don't even look at at these own declarations. The pedley declaration that Mr Owen referred to at pages 1 13 to 1 14 says, and I think at least four paragraphs, it is the covered entity doing the purchasing. The lot declaration, which we submitted to 84 to 2 86 confirms it is the covered entity doing doing the doing the ordering. The district court certainly accepted that over either of the Shidler declarations, which, you know, frankly, really didn't survive current first contact with our declarations. Eso it is. It is again, the covered entity is doing the buying on survive first contact. Your honor, if you were to read the Shidler declaration, our declarations and its main declarations, the Shidler declarations do not hold up. They're very weak. They're thoroughly rebutted. And again, the district court was on extremely solid ground in accepting our view of the facts and not Abbey's. And we asked the court, of course, to affirm. Thank you. Thank you, Your Honor. A few brief points in rebuttal, but I'm happy to address any questions on the court's mind. Of course, I think I'd like to start where my friend did and try to work through the points that he made. The first is you'll notice that when asked about the point of the statute and why Mississippi's law is acceptable, the first thing my friend said was that, well, it helps the 340B program work as it's supposed to. And that's not, of course, Mississippi's job. It's the job of HRSA to make it work the way it's supposed to. I want to make sure the court knows that, roughly speaking, at 50,000 feet, what Abbey's policy is doing is basically the way this whole program worked for the majority of its existence. In 1996, the agency issued a non-binding guidance document that basically said it should work more or less the way Abbey's policy works now. If you don't have an in-house pharmacy, you can use one pharmacy, but you've got to maintain title to the drugs and you have to have some purchasing agent authority. Then in 2010, the agency decided, why not blow the lid off the thing? You can use unlimited contract pharmacies. And that decision transformed this program into the second largest drug program in existence in the federal government without any word from Congress that changed it from the tail to the dog. That's a suit against the agency. That's not a suit against the state, is it? Well, no, Your Honor, the point I'm making is that Mississippi is trying to get back to the post-2010 big time version of this program. And this is responsive, I think, to all of Your Honor's questions about whether there is an effect size, whether there's an additional quantity. We know there's an additional quantity because the policy Mississippi is trying to force us to adopt is what exploded the program by... Is there 400 units or do the 400 units not exist? Absolutely. Here, I mean... How do I know? There's two ways you know, and I don't want to get... I don't want to... I'm not skirting your record question, but I just... I gotta just say the statute first. One way you know it is on the face of the statute. I heard a lot about delivery. The statute says acquisition. So we know that it is on its face a prohibition on not letting someone acquire the extra 400 drugs, and that's what we're mad about. But in addition to that, if you read, for example, the Shidler declarations, I know Mr. Stewart has some... He thinks that they don't hold up. I think they do. There wasn't like a contested evidentiary hearing. Nobody got deposed. Mr. Shidler is explaining how AbbVie fills its orders. This is a thing he knows about. This is not guesswork. This is how it works. And his declarations and all of the record evidence shows that the difference between what we're trying to do, like a limited, reasonable restriction on 340B orders to right covered entities, and this unreasonable nationwide, any contract pharmacy you like, has significant millions of dollars worth of effects, both on us, on manufacturers. Is it because it's hard to tell who the patients are and whether they are patients? Actually, Your Honor, and the record reflects this in the Shidler declarations, but this is totally undisputed. Nobody knows what they think a patient definition is. They won't tell. That is, discovered entities have a black box algorithm. What they... And there is, at page 719 of the record, there's... Mr. Shidler says some of them use a once a patient, always a patient model. By way of example, my partner, Ms. Pohl, went to law school in Mississippi, and I'm told that she once went to the University of Mississippi Medical Center to fill a prescription. No one knows whether... If she now went to a contract pharmacy in Hawaii, which is a real example of a contract pharmacy that has an arrangement with UMMC, and wanted to fill a prescription for anything, they would say, oh, you must be a 340B patient, we'll get a replenishment order. That is the secret sauce. That's why the... It's where the extra 400 units come from. They come from, basically, diversion, or at least the risk of diversion. The commercial risk of which we're trying to address in ways the federal courts have said are reasonable. And the method by which they are trying to restrict us from doing that is, on the face of the statute, an acquisition requirement. I did wanna say one other thing. I understand these violations of... Are they arguing this case if they were just saying they wanna send refrigerated trucks and make sure you keep the drugs safe? I think we... I think the answer is yes, but for a technical reason. I noticed that Mr. Stewart's example of a delivery regulation was a generally applicable law, whereas this law applies only to 340B sales. On the face of the statute, in order for any of this to apply to you, it has to be that you're participating in the federal program. And Mississippi doesn't care how drugs are delivered, unless they're 340B drugs, and then they have to be delivered at the right price, which is... Everyone agrees if this is a price regulation, it is preempted. And I think all we've been hearing is ways of dancing around the heart of it, which is they want the 340B price to be available to transactions that we don't want to use that price for, and that Congress has said, you don't have to. And in the end, all the rest is noise. If they agree that we don't have to do anything different than our policy because that complies with Mississippi law, then that would be one thing. But our policy says when we will sell and when we will not sell to covered entities who do not have an unlimited right to the 340B price, they have a right to have an offer for a 340B price on reasonable terms, and these terms are reasonable, that we don't have to deliver them to the lunar surface, which, by the way, is a real quote from the agency when they took the opposite position. We're dealing with an injunction, and so we really haven't talked about that at all. We've been dealing with the law, but it would not be unconstitutional for Mississippi to say, please send it to these other places where there are, maybe not Hawaii, but please send this to our patient, who is a 340 patient, is in a rural area, and it's within the 1,000 normal units, and everyone agrees that it needs to go to this rural place instead of to the university hospital. Do you think that would be unconstitutional? Please send this drug for the known 340 patient to the place where the patient can access it, and that's consistent with Congress, isn't it? I want to be clear. I think the answer could be that. I don't know, but it might be all right, but not in a remedial scheme where all of those federal questions are adjudicated in a state criminal court instead of by the agency, which is the ultimate. I mean, so maybe, Your Honor . . . That's a question for the federal agency that's administering the 340 and not for the state of Mississippi to try to maneuver around to get its own answer. For sure, and I think this is actually really important. I mean, I think my friend acknowledged that there are federal law restraints. Like, if we don't have to cooperate with . . . Mississippi says you have to give these 340B drugs. You have to deliver them to a pharmacy that everyone knows is engaged in unlawful diversion. We surely have a federal right not to do that because that's illegal under the federal 340B statute. Is that a defense that we raise at a state trial, a criminal proceeding in Mississippi, or is that a proceeding that's supposed to be held where the Supreme Court in Astra said it's supposed to be held, which is before the Administrative Dispute Resolution Tribunal established by the Secretary, which they have now done. There is a regulation. It has the force of law. It sets up tribunals to adjudicate those disputes. And in Astra, what the Supreme Court said is the exclusivity of that forum means there can't be civil suits between covered entities and manufacturers over the exact issues that the state of Mississippi now says we'll have litigation on our own behalf against manufacturers on the same issues. And in any event, Judge Elrod, no matter what they did, they could not say, just to go back to your hypothetical about a law saying, well, you have to give it to this patient that everyone knows is not diversion and it's a real patient. That has no relationship to this statute, which says that you cannot deny or interfere with any acquisition or delivery of a 340B drug to any 340B entity or its pharmacy. And I would observe the definition of 340B entity in HB 728 itself includes pharmacies. So this law, even if there were some thing about the statute that you've just described, like maybe a different scheme, it doesn't have anything to do with this. Do you all have anything? Thank you. We have no arguments. Thank you, Your Honor. We've been long. Thank you for answering our questions in this complicated case. This case is submitted. The court will stand in